**WO**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

Federal Trade Commission,

Plaintiff,

vs.

Credit Glory LLC, et al.,

Defendants.

No. CV-26-05387-PHX-SPL

**ORDER**

Before the Court is Plaintiff's Motion for Preliminary Injunction (Docs. 4, 17).[1] For the following reasons, the Court will grant the Motion for Preliminary Injunction.

## I. BACKGROUND

On August 3, 2026 Plaintiff, the Federal Trade Commission ("FTC" or "Plaintiff"), filed a Complaint, bringing seventeen claims against twenty-two Defendants. (Doc. 3). That day, Plaintiff also filed an Ex Parte Motion for Temporary Restraining Order ("TRO") with Asset Freeze, Appointment of Receiver, and Other Equitable Relief and Order to Show Cause Why a Preliminary Injunction Should Not Issue. (Doc. 4).[2] Plaintiff sought a Temporary Restraining Order ("TRO") against Defendants "to halt a pernicious, massive credit repair scam that has stolen almost $200 million from

---

[1] At the September 2, 2026 Preliminary Injunction hearing, Defendants also moved to dissolve the Temporary Restraining Order and lift the asset freeze. (Hearing Tr. at 223).

[2] Plaintiff also moved to temporarily seal the case until 72 hours after the Court's Order on the TRO, and the Court granted that request. (Docs. 1, 2).

consumers." (*Id.* at 2, ¶ 1). On August 4, 2026, the Court granted the Motion for TRO, as well as Plaintiff's other requests, and set a Preliminary Injunction hearing. (Doc. 18).[3]

The Defendants are seventeen entities and five individuals. (Doc. 3). The Complaint alleges violations of the FTC Act, the Credit Repair Organizations Act, the FTC's Telemarketing Sales Rule, the Gramm-Leach-Bliley Act, the Restore Online Shoppers' Confidence Act, the Electronic Fund Transfer Act, and 12 C.F.R. § 1005.10(b), related to Defendants' "deceptive marketing and sale of credit repair services." (*Id.* at 3, ¶ 1). Plaintiff alleges that "Defendants operate an unlawful credit repair scheme," wherein they "pose as legitimate debt collection agencies and creditors, including those that operate for the benefit for veterans, members of the military, and their spouses." (*Id.* at 3–4, ¶ 2). Defendants promise to help consumers improve their credit scores "by removing negative items from their credit reports." (*Id.* at 4, ¶ 2). Plaintiff also alleges that Defendants file false identity theft reports and "charge illegal advance fees, including recurring fees on a negative option basis." (Doc. 17 at 15).

Plaintiff asserts that the Defendants act as a common enterprise. (*Id.* at 17). There are nine "consumer-facing entities," which operate as Credit Glory, Credit Sage, Credit Joy, Credit Clerk, and Standard Scores. (*Id.*). In addition, there are eight "lead-generation entities" that "place the Google ads used to solicit consumers or [are] named in the generic landing pages associated with the Google ads." (*Id.* at 18). The five individuals "manage and run the scheme." (*Id.* at 17, 19–22). Plaintiff asserts that the alleged credit repair scheme has been in operation since "at least 2016," and Defendants' conduct falls into three categories of violations: (1) "deceptive impersonations and false and misleading promises regarding credit repair services," (2) "collecting prohibited advance fees," and (3) "unlawful enrollment practices." (Doc. 17 at 24).

## II. LEGAL STANDARD

A preliminary injunction is "an extraordinary and drastic remedy, one that should

[3] The Preliminary Injunction hearing was originally set for August 12, 2026, but the parties stipulated to continue the hearing to the current date. (Doc. 22).

not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Fraihat v. U.S. Immigr. & Customs Enf't*, 16 F.4th 613, 635 (9th Cir. 2021) (citation omitted). A party seeking injunctive relief under Rule 65 of the FRCP must show that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of injunctive relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The Ninth Circuit observes a "sliding scale" approach that balances these elements "so that a stronger showing of one element may offset a weaker showing of another." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). Thus, an injunction can issue where there are "'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff . . . so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id.* at 1135. Still, "[l]ikelihood of success on the merits is the most important *Winter* factor; if a movant fails to meet this threshold inquiry, the court need not consider the other factors in the absence of serious questions going to the merits." *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017) (internal citations and quotation marks omitted).

In addition, the FTC has a "lighter burden" when seeking to preliminarily enjoin a violation of FTC law. *FTC v. Microsoft Corp.*, 136 F.4th 954, 964–65 (9th Cir. 2025). "'Upon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest,' a district court may grant a preliminary injunction." *Id.* at 964 (citing 15 U.S.C. § 53(b)). The FTC "need not show irreparable harm to obtain a preliminary injunction," so the analysis focuses on "(1) the likelihood that the Commission will ultimately succeed on the merits; and (2) the balance of the equities." *Id.* (citing *FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1159–60 (9th Cir. 1984) (internal quotations omitted)). The Court's analysis will focus on those

two factors.[4]

## III. DISCUSSION

### A. Service and Personal Jurisdiction

At the outset, the Court will address issues of service and personal jurisdiction relating to three individual Defendants: Alexander N. Brola, Liam Pavel Tame Te Amorangi Tira Emery, and Marko Petkovic. In Defendants' filing of several documents, including the Defendants' Response to the Motion for Temporary Restraining Order and Preliminary Injunction (Doc. 30), they state that Defendants Brola, Emery, and Petkovic were not party to the filing of those Motions. (Doc. 34 at 1–2). At the Preliminary Injunction hearing, Defendants stated that Defendant Petkovic traveled from out of the country to attend the hearing and accepted service the morning of the hearing. (Hearing Tr. at 12:2–6). As to Defendants Brola and Emery, Defendants stated that they had not yet been served. (Hearing Tr. at 14:2–5).

Defendants assert that the Court cannot enter a Preliminary Injunction against Defendants who have not been served because the Court lacks jurisdiction. (Hearing Tr. at 14:2–11, 216:1–19). Plaintiff asserts, on the other hand, that notice and opportunity to be heard is all that is required to enter a preliminary injunction. (Hearing Tr. at 213:24–214:13). Plaintiff highlighted at the hearing that Defendants' counsel filed a Notice of Appearance on behalf of all parties, including Defendants Brola and Emery, and that they had a chance to file a Response to the Motion, but did not. (*Id.*).

Under Rule 65(d)(2), a preliminary injunction order is only binding to three categories of people who "receive actual of it by personal service or otherwise": "the parties," "the parties' officers, agents, servants, employees, and attorneys," and "other persons who are active in concert or participation with anyone" described in the two previous categories. Fed. R. Civ. P. 65(d)(2)(A)–(C). Many courts in the Ninth Circuit

---

[4] In their Response, Defendants only address likelihood of success and the balance of the equities in light of the Ninth Circuit's decision in *Microsoft*. (*See* Doc. 30 at 21, n.35).

defer to the general rule that a Court may not issue a preliminary injunction absent service of process. *See Cunningham v. Pedroza*, No. 1:23-cv-00041-ADA-EPG (PC), 2023 WL 2645666, at *2 (E.D. Cal. Mar. 27, 2023) (citing *Robertson v. Kaiser-Nevel*, No. 20-02523 BLF, 2021 WL 629318, at *1 (N.D. Cal. Jan. 4, 2021); *Waterbury v. Scribner*, No. 1:05-cv-000764-LJO DLB, 2007 WL 781877, at *1 (E.D. Cal. Mar. 13, 2007)); *Cestro v. Navajo Cnty., et al.*, No. CV-23-08608-PCT-JAT, 2024 WL 1142060, at *1 (D. Ariz. Mar. 15, 2024) ("Plaintiff has not yet served any Defendant named in the amended complaint. The Court also cannot issue what would amount to a preliminary injunction without notice to the Defendants."). However, other courts follow the rule that service of process is not necessary to meet Rule 65's notice requirement. *See Wavve Ams. Inc. v. Unknown Party*, CV-24-02667-PHX-KML, 2025 WL 834917, at *2, n.6 (D. Ariz. Mar. 17, 2025) ("A plaintiff need not complete service of process to satisfy the notice requirement for issuance of a preliminary injunction."); *Footprint Intern., LLC v. Footprint Asia Ltd.*, No. CV-24-00093-PHX-DGC, 2024 WL 776604, at *2 (Feb. 26, 2024) ("As courts have explained, 'Rule 65(a) does not require service of process, but rather requires notice to the adverse party'") (citing *Whirlpool Corp. v. Shenzhen Sanlida Elec. Tech. Co., Ltd.*, 80 F.4th 536, 542 (5th Cir. 2023); *H-D Michigan, LLC v. Hellenic Duty Free Shops S.A.*, 694 F.3d 827, 842 (7th Cir. 2012)); *Xu v. Lai*, No. 2:25-cv-02587-MRA-SSC, 2025 WL 4631987, at *4 (C.D. Cal. Dec. 23, 2025) ("Rule 65's reference to 'notice' and the very nature of preliminary relief contemplate that such relief may be issued before service has been perfected.").

Here, because it appears that Defendants Brola and Emery, the only Defendants who have not been served, have received notice of the Motion for Preliminary Injunction pending against them, the Court does not find that it is barred from ruling on the Motion as to them. Defendants' counsel filed a Notice of Appearance on their behalf (Doc. 21), even though Defendants Brola and Emery were not party to filing the Response to the Motion for Preliminary Injunction. (Doc. 34). Their counsel filed a Response on behalf of all the other Defendants, including companies that Defendant Brola owns, and including

Defendant Petkovic, who had also not been served until he appeared in-person to testify at the Preliminary Injunction hearing.

As to personal jurisdiction, Plaintiff argues that "entry of a preliminary injunction only requires that the Court find good cause to believe that it will have jurisdiction." (Doc. 40 at 6, n.2). The FTC Act does, as Plaintiff asserts, contain a nationwide service of process provision. (Doc. 40 at 6, n.2); *FTC v. Consumer Defense, LLC*, 772 Fed. App'x 508, 509 (9th Cir. 2019). Thus, it is likely that FTC would have personal jurisdiction over any Defendants who live out of the country, such as Defendant Emery. The Court finds that there is sufficient notice and a likelihood that the Court will have personal jurisdiction over all Defendants, such that it may issue a preliminary injunction as to all Defendants.

**B. Likelihood of Success on the Merits**

"In addressing the likelihood-of-success factor under § 13(b) of the FTC Act, we have stated that the FTC 'meets its burden if it raises questions going to the merits so serious, substantial, difficult and doubtful as to make them fair ground for thorough investigation, study, deliberation and determination by the FTC in the first instance and ultimately by the Court of Appeals.'" *Microsoft Corp.*, 136 F.4th at 965 (citing *Warner*, 742 F.2d at 1162). Here, Plaintiff has raised such serious, substantial, difficult, and doubtful as to warrant a preliminary injunction.

Plaintiff establishes in the briefing that it is likely to succeed on multiple claims. The Complaint contains seventeen counts. (Doc. 3). But as Defendants explain, the "seventeen-count complaint, its requests for injunctive relief and $172 million in consumer redress requested relief are based primarily on claims that Defendants required illegal advanced payments in violation of its own Telemarketing Sales Rule and engaged in deceptive trade practices." (Doc. 30 at 22).

**1. Advance Fees**

As to the illegal advance fees, Plaintiff asserts that Defendants "require consumers to pay an up-front fee to enroll in the credit repair services," in violation of Section

404(b) of the Credit Repair Organizations Act ("CRO Act") and Section 310.4(a)(2) of the Telemarketing Sales Rule ("TSR"). (Doc. 17 at 52) (citing 15 U.S.C. § 1679b(b), 16 C.F.R. § 310.4(a)(2)).

*a. Legal Standard*

Section 404(b) of the CRO Act provides that: "[n]o credit repair organization may charge or receive any money or other valuable consideration for the performance of any service which the credit repair organization has agreed to perform for any consumer before such service is fully performed." 15 U.S.C. § 1679b(b). This provision "prohibits acceptance of any payment before fully performing all services." *F.T.C. v. Gill*, 265 F.3d 944, 956 (9th Cir. 2001). In addition, the TSR makes the following conduct unlawful:

> Requesting or receiving payment of any fee . . . to remove derogatory information from, or improve, a person's credit history, credit record, or credit rating until (i) the time frame in which the seller has represented all of the goods or services will be provided to that person has expired; and (ii) the seller has provided the person with . . . a consumer report from a consumer reporting agency demonstrating that the promised results have been achieved, such report having been issued more than six months after the results were achieved.

16 C.F.R. § 310.4(a)(2)(i)–(ii).

*b. Analysis*

Based on all the evidence provided to the Court, Plaintiff is likely to succeed on its claim that Defendants charge illegal advance fees. The evidence shows, and Defendants do not dispute, that during an initial phone call with a consumer, Defendants typically take payments for services. Defendants usually charge a $1.00 up-front fee to verify a customer's identity or pull their credit report, as well as another charge ranging from $178.00–$578.00. (*Id.* at 53). A former employee of Credit Sage declared that customers were charged one dollar to access the credit report, which was paid to a company called Standard Scores,[5] and the customers would then be charged a monthly fee. (Doc. 5-1 at

---

[5] In their Response brief, Defendants argue that the $1.00 fee should not be considered an illegal advance fee because Defendant Standard Scores "does not represent itself as a credit repair organization (and is not a credit repair service at all)." (Doc. 30 at

6–7). In addition, customers were told that to purchase the Credit Sage repair service, they "were required to make a one-time $378 payment up front," though the amount could be varied, and there was also a monthly recurring fee. (*Id.* at 8; *see also* Doc. 5-5 at 12, 16–17, 18, 20, 22). In addition, Plaintiff provides evidence that when Defendants suggested that the up-front fee was to resolve the outstanding debt, the payments "do not go toward resolving the debts but remain in Defendants' coffers." (Doc. 17 at 53 (citing Doc. 5-1 at 5, Doc. 5-2 at 2, Doc. 6 at 89, 90, 92)).

Defendants provide several arguments as to why the payments received in initial phone calls do not violation prohibitions on advance fees. First, Defendants respond by arguing that the TSR itself is invalid for several reasons. None are persuasive at this stage. Defendants assert that the TSR's six-month waiting period exceeds FTC's rulemaking authority because "[n]othing in the statutory text of the Telemarketing Act provided the FTC with authority to issue a rule as to the time when a request for payment could be made," and "the FTC is limited to enforcing the advance payment of the CRO [Act]." (Doc. 30 at 25, 26). Defendants also argue that the application of the TSR is arbitrary and capricious because FTC has promulgated a "markedly different advance payment" rule in 16 C.F.R. § 310.4(a)(4), which Defendants argue reflects more onerous treatment for credit repair organizations.[6] (*Id.* at 27–28).

Given the conduct alleged here and the stage of the litigation, these arguments are not persuasive. The legitimacy of the TSR and the waiting period it imposes has no bearing on the fact that charging up-front payments still violates the CRO Act's prohibition on payment prior to any services being rendered at all. In addition, the Court does not find that evaluating the constitutionality of FTC's regulation of credit repair organizations is appropriate for the analysis at this stage. It is enough that Plaintiff has shown evidence indicating that Defendants violated the CRO Act and an FTC Rule; the

---

15–16). Even so, Defendants do not address the other up-front fees charged by, and apparently paid to, the other Defendants, which do purport to be credit repair services.

[6] This Rule revolves around advance payments for services in obtaining a loan or line of credit.

analysis related to FTC's promulgation of the TSR does not move the needle on the merits analysis at this stage.

Next, Defendants argued at the Preliminary Injunction hearing that Defendants only receive payment for fees once services have been provided. (Hearing Tr. at 11:5–6 ("We're very careful about how we charge our fees. We don't charge fees before service is completed.")). As to the $1.00 fee, Defendants provided testimony that the service of obtaining a credit report has already been completed during the phone call when the dollar is paid. (Hearing Tr. at 112:19–113:4). Evidence shows that the "set-up" fees could range from $199–$978. (Hearing Tr. at 115: 16). After a consumer agrees to pay the fee, the sales representative sends them a two-page contract, and once they sign, they get access to the portal. (Hearing Tr. at 115:17–25). The consumer receives access to the portal before the credit card is charged. (Hearing Tr. at 116:1–2). Through the portal, customers gain access to their credit report, credit scores, the status of their disputes, and an education section with resources about credit. (Hearing Tr. at 118:2–8).[7]

Though the Court appreciates that customers gained access to their credit report and the portal during the initial phone call, Defendants' argument is unavailing because the credit repair services were not complete at this time. Testimony at the hearing showed that when Defendants send dispute letters on a company's behalf, they write up the letters, and a third-party actually sends them out. (Hearing Tr. at 114:21–115:9). The sales representative informs the customer that the letter will be sent within twenty-four hours. (Hearing Tr. at 118:21–23). Although dispute letters may be prepared at the time of the phone call, there is no question that the repair services have not been completed when the set-up fee is taken. This conduct appears to violate the CRO Act's prohibition against charging payment for a service before it is "fully performed."

For all these reasons, the Court finds that Plaintiff is likely to succeed on the

---

[7] During the Hearing, Defendants showed the Court the portal by projecting it on screen in the Courtroom. (Hearing Tr. at 169:13–24). That testimony was sealed due to personally identifying information that may appear in the portal. However, the Court heard detailed testimony on the resources in the portal.

merits of its claims based on illegal advance fees.

**2. Deceptive and Misleading Practices**

As to the deceptive practices, Plaintiff alleges that Defendants make false and misleading representations to market their credit repair services by (1) impersonating debt collection entities, (2) taking out deceptive Google advertisements, and (3) making false promises about credit repair without actually providing the services. (Doc. 17 at 24–52).

*a. Legal Standard*

"Section 5 of the FTC Act prohibits . . . unfair or deceptive acts or practices in or affecting commerce." *FTC v. Stefanchik*, 559 F.3d 924, 928 (9th Cir. 2009) (internal quotations omitted) (citing 15 U.S.C. § 45(a)(1)). "An act or practice is deceptive if first, there is a representation, omission, or practice that, second, is likely to mislead consumers acting reasonably under the circumstances, and third, the representation, omission, or practice is material." *Gill*, 265 F.3d at 950 (internal quotations and citations omitted). To determine whether a practice or act is likely to mislead, the Court must assess "the net impression it creates," even if the representation "also contains truthful disclosures." *FTC v. Cyberspace.Com LLC*, 453 F.3d 1196, 1200 (9th Cir. 2006). The FTC Act "is violated if it induces the first contact through deception, even if the buyer later becomes fully informed before entering the contract." *Resort Car Rental Sys., Inc. v. FTC*, 518 F.2d 962, 964 (9th Cir. 1975). In addition, "[a]dvertising capable of being interpreted in a misleading way should be construed against the advertiser." *Id.* Finally, "[p]roof of actual deception is unnecessary to establish a violation of Section 5." *Trans World Accounts, Inc. v. FTC,* 594 F.2d 212, 214 (9th Cir. 1979).

In addition to the FTC Act, Section 404(a)(3) of the CRO Act provides that it is unlawful to "make or use any untrue or misleading representation of the services of the credit repair organization." 15 U.S.C. § 1679b(a)(3). "Liability attaches even if the representation made by the credit repair organization is not made for the purpose of inducing consumers to purchase a particular service or good." *Gill*, 265 F.3d at 955

(internal quotations and citations omitted). "All the FTC must show to establish violations of both acts, then, is an untrue or misleading statement regarding the services of the CRO." *Id.* The CRO Act also deems it unlawful to "engage, directly or indirectly, in any act, practice, or course of business that constitutes or results in the commission of, or an attempt to commit, a fraud or deception on any person in connection with the offer or sale of the services of the credit repair organization." 15 U.S.C. § 1679b(a)(4).

*b. Analysis*

In the briefing, Plaintiff provided extensive evidence that Defendants initiate or solicit business through deceptive means, namely through Google advertisements. (Docs. 17, 40). FTC alleges that "Defendants purchase Google ads" with the purpose of "lur[ing] customers searching for legitimate debt collection agencies or creditors." (Doc. 17 at 28–29) (citing Doc. 5-1 ("My recollection is that if a consumer used Google to search for a large debt collection agency like Midland Credit, for example, a Credit Sage or Credit Glory advertisement containing our telephone number appeared as the first listing in the search results—even above the listing for the actual debt collection agency itself. . . . By clicking on our phone number in our advertisement, the consumer was connected to us by telephone.")). Plaintiffs cite evidence that Defendants established Google Ad accounts that included keyword phrases, of which many were associated with collections agencies. (Doc. 17 at 29–30) (citing Doc. 6-2 at 18–48). These keywords include phrases like "USAA Collections," "Sprint Collections contact," "call experian," "credit karma customer service," "Impact Receivables Management customer service," "LVNV contact," "Portfolio Recovery Collections Phone Number," and many more variations. (Doc. 6-2 at 18–48).

Thus, "[w]hen consumers click on the ad or phone icon thinking they are calling the real debt collection entities or creditors, they instead reach Defendants." (Doc. 17 at 32). Plaintiff has provided evidence showing that once a customer reaches Defendants, Defendants "do nothing to dispel consumers' belief that they are talking with the debt collection entities or creditors," by "not affirmatively stat[ing] that they are not the

entities consumers think they are calling," or even affirmatively replying that they are those entities. (*Id.* at 32–33). For example, when a customer asked if she was speaking with "Impact Receivables Management," the representative on the phone told her "We work with Impact." (Doc. 6 at 91).

In addition, Plaintiff asserts that Defendants have several websites, "including creditglory.com, creditsage.com, creditclerk.com, creditjoy.com, gloryservices.com, and standardscores.com." (Doc. 17 at 37). Plaintiff argues that the information on the websites is deceptive because "they make numerous claims about improving consumers' credit, such as: "On average, we assist our clients in boosting their FICO scores by 120 points," "95% customer satisfaction," and "Get Credit Report Errors Fixed. Enjoy More Favorable Loan Terms." (*Id.* at 37–38). Plaintiff details the "false promises" that Defendants make in stating that they can be paid to resolve debt or remove inaccurate information from credit reports by contacting credit reporting agencies, but then Defendants do not substantially improve consumers' credit scores. (*Id.* at 39–52).

Defendants set forth several arguments in response regarding the insufficiency of the FTC investigation, their compliance policies, and the quality of the services they provide.[8] As to the FTC's evidence and investigation, Defendants assert that the evidence is insufficient and does not reflect the reality of the services they provide. (Doc. 30 at 11). They highlight that Plaintiff's evidence is limited to two former employees,[9] one

---

[8] Defendants do not address, in depth, the evidence relating to the Google advertisements and keywords. In the Response brief, Defendants argue that Plaintiff "does not point to anything specific that is deceptive or otherwise unlawful" and the "use of those services is entirely appropriate and consistent with Google's own extensive marketing of such services." (Doc. 30 at 12). Defendants cite as evidence resources on how to use Google advertisements which state that such advertising "is one of the most effective ways to drive targeted traffic, generate leads, and increase brand visibility online." (*Id.* n. 21). The Court does not find these arguments persuasive. There is extensive evidence showing manipulation of targeted advertisements to lead customers to believe they are calling other entities. Any standards used by Google are irrelevant to the law under the FTC Act and CRO Act.

[9] Defendants describe the former employees as disgruntled employees who were terminated. Defendants also presented evidence at the hearing that one former employee who contacted the FTC about Defendants was terminated by Defendants and has a criminal history. (Hearing Tr. at 76). The former employee had been previously charged

employee of a collection service, summaries of only twelve consumers, and one consumer declaration for a single company. (Doc. 30 at 11). Specifically, Defendants provided evidence at the hearing that the FTC investigators only interviewed twenty out of forty to fifty thousand active customers (Hearing Tr. at 56:2–4) and only chose to interview consumers who had filed complaints with FTC or the Better Business Bureau. (Hearing Tr. at 57 at 13–22). Defendants also provided evidence through their cross-examination of the FTC investigator that the twenty consumers did not submit declarations and the investigator instead prepared summaries and shared them with the consumers. (Hearing Tr. at 61:2–14). Defendants also raised issues surrounding the one consumer declaration submitted by a consumer with the consumer's statements not being compared to the recording of her call. (Hearing Tr. at 62–65).

The Court finds that the amount of evidence submitted does not belie a finding of likelihood of success on the merits. As Plaintiff asserts, there is evidence related to sixteen consumer statements, former employees, telemarketing scripts, a supervisor from a debt collection agency which Defendants allegedly impersonated, and documentary evidence related to the operation of Defendant companies. (Doc. 40 at 8). At the hearing, Plaintiff's investigator testified that there were over 1,800 complaints filed in the FTC's complaint database. (Hearing Tr. at 29: 4–6). Of the 1,800, there were ten complaints from employees and former employees of Defendants "complaining specifically about the defendants' business practices." (Hearing Tr. at 29:9–11). He also testified that there were over 1,600 one-star reviews on Trustpilot. (Hearing Tr. at 29:14–15). The investigator interviewed eight consumers and three employees were interviewed. (Hearing Tr. at 31). The investigator also found a training video on a Google drive account addressing the "credit consultants," wherein the person administering the training describes that customers think they're talking to a debt collector or a creditor, and teaches "how to use that to best complete the sale." (Hearing Tr. at 40–41). The Court finds, despite Defendants' arguments about the shortcomings of the investigation, that the

with forgery in the second degree. (Hearing Tr. at 79:8–13).

evidence submitted is sufficient to show a likelihood of success on the claims.

Next, Defendants argue that evidence of their compliance policies and procedures shows that Plaintiff is not likely to succeed on the merits. In the Response Brief, Defendants submitted evidence that a quality assurance team "conducted routine compliance audits, reviewing recorded calls, CRM documentation, enrollment activity and compliance statement delivery against the Company's written standards. (Doc. 30 at 9) (citing Doc. 30-7 at 2, ¶¶ 7–8). Defendants also state that they "maintained formalized refund policies and procedures" to ensure that customers received refunds when applicable. (*Id.* at 10); (*See also* Doc. 30-7 at 2, ¶ 11 ("Sales representatives are instructed to never represent themselves as debt collectors to the customer.")). At the hearing, Defendants' Sales Director testified that customers are told "several times" who the entity is that they are talking to (Hearing Tr. at 107:10–22) and sales representatives who "posed as debt directors and creditors" were disciplined, including with termination. (Hearing Tr. at 108:23–109:16).

But the Court was also presented with evidence of company trainings that acknowledged that when customers call Defendants, they think they are speaking with a debt collection agency. (*See* Hearing Tr. at 40–41; Doc. 38, Exh. 35).[10] In addition, the FTC investigator testified that "[o]ver and over again, the complaints said that when the tried to call debt collectors creditors, they reached Defendants and thought they were speaking to them." (Hearing Tr. at 37:8–21). The evidence surrounding the policies and procedures that were supposed to be in place is less compelling than Plaintiff's extensive evidence of the deceptive practices that allegedly occurred in reality.

Finally, throughout the Response brief and the hearing, Defendants point to the credit-related services they provided to the customers, as well as some positive customer reviews. For example, the customer service director for Defendants testified that fewer

---

[10] This training video, submitted as Exhibit 35 to the Receiver's Report (Doc. 38), directs employees to respond to customers who think they are speaking with a debt collection agency by stating something like: "We actually handle the collections that ABC Collections place in your credit report."

than eight to four percent of customers call to complain about the service they received. (Hearing Tr. at 146–47). Defendants also provided evidence of their positive reviews, including that Credit Glory has 10,009 reviews with 93 percent five-star ratings and 96 percent four-star or above ratings, and that Credit Sage, Credit Clerk, and Credit Joy also have very high reviews. (Hearing Tr. at 68). But even assuming Defendants follow through with credit repair services, the FTC Act "is violated if it induces the first contact through deception, even if the buyer later becomes fully informed before entering the contract" and "[p]roof of actual deception is unnecessary to establish a violation of Section 5." *Resort Car Rental Sys., Inc. v. FTC*, 518 F.2d 962, 964 (9th Cir. 1975); *Trans World Accounts, Inc. v. FTC*, 594 F.2d 212, 214 (9th Cir. 1979).

For these reasons, the Court also finds that Plaintiff is likely to succeed on its claims based on Defendants' deceptive practices.

**C. Balance of Equities and Hardships**

Before issuing a preliminary injunction, "courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Winter*, 555 U.S. at 24 (citation omitted). Given Plaintiff's likelihood of success on the merits, the effective resolution of the FTC's case is an important interest for the Court to balance. Indeed, "when a district court balances the hardships of the public interest against a private interest, the public interest should receive greater weight." *FTC v. World Wide Factors, Ltd.*, 882 F.2d 344, 347 (9th Cir. 1989). In addition, "there is no oppressive hardship to defendants in requiring them to comply with the FTC Act." *Id.* The balance of the equities weigh toward granting the requested relief to Plaintiff. However, Defendants raise issues with the hardships associated with the asset freeze and the receivership, which the Court will address.

Defendants argue that the asset freeze, which covers all assets, is overbroad. (Doc. 30 at 17). They also argue that the receivership is "overbroad and unnecessary" and has effectively shuttered Defendants' businesses. (*Id.* at 45). Defendants argue that the Court should dissolve the asset freeze with respect to the five individual Defendants. (*Id.* at 17–

19). Specifically, they argue that the dissipation of assets is "wildly speculative" and that overseas transfers are not in and of themselves impermissible because some of the Defendants live overseas. (*Id.* at 29–30). As to the receivership, they ask that the Corporate Defendants be allowed to remain in business with a Court-appointed monitor who would not have direct control over the business or its assets. (*Id.* at 46). They also suggest that the Corporate Defendants could submit a "monthly operating budget" to the Receiver, subject to the Receiver's review and approval. (*Id.* at 48). They also ask for a modification of the asset freeze to allow for living expenses and payment of legal fees. (*Id.* at 48–50).

"Courts regularly have frozen assets and denied attorney fees or limited the amount for attorney fees." *World Wide Factors*, 882 F.2d at 347. "A party seeking an asset freeze must show a likelihood of dissipation of the claimed assets, or other inability to recover monetary damages, if relief is not granted." *Johnson v. Couturier*, 572 F.3d 1067, 1085 (9th Cir. 2009). In addition, an individual who has financially benefitted from unlawful actions "is presumably more than capable of placing assets in his personal possession beyond the reach of a judgment." *Id.* "A district court may, within its discretion, forbid or limit payment of attorney fees out of frozen assets." *Commodity Futures Trading Com'n v. Noble Metals Intern., Inc.*, 67 F.3d 766, 775 (9th Cir. 1995) (collecting cases). "Discretion must be exercised by the district court in light of the fact that wrongdoing is not yet proved when the application for attorney fees is made." *Id.*

Plaintiff contends that, should the Court determine that the FTC is likely to prevail on the merits, the asset freeze and the recievership should be continued because the refunding of money is an appropriate final remedy. (Doc. 40 at 29). Plaintiff states that Defendants have "stolen almost $200 million from consumers." (*Id.* at 6). Plaintiff also highlights that "over $61 million has already flowed from corporate to individual accounts and significant amounts to offshore accounts potentially beyond the reach of the Court." (*Id.* at 29). Plaintiff also argues that it need not determine the precise amount of monetary relief at this stage, and Defendants Brola, Emery, and Petkovic's failure to

produce financial statements makes it unclear how much money they control. (*Id.* at 30).

At the hearing, Plaintiff provided evidence through its investigator's testimony of fraud indicators associated with Defendants' businesses including: the use of impersonation, twenty different addresses across multiple jurisdictions, having multiple consumer-facing companies and LLCs, twenty-four different merchant accounts, and money movement overseas with accounts in various countries, which is not illegal, but can indicate fraud in certain situations. (Hearing Tr. at 41–51). Specifically, the investigator testified about a text message from Defendant Brola which stated, in his own words, "it's better to have ten complaints over ten companies rather than ten complaints in one company, or something to that effect" and "The CFPB is always looming." (Hearing Tr. at 44:15–17, 47:14–15).

The Court finds that the evidence before it requires a continuation of the asset freeze and receivership at this time. The Court agrees with Plaintiff that both measures are necessary to "prevent the same sort of ongoing harm that the ultimate object of the § 13(b) litigation—the issuance of a permanent injunction—is intended to achieve." (Doc. 40 at 29 (citing *FTC v. Noland*, No. CV-20-00047, 2021 LEXIS 182346, at *14–15 (D. Ariz. Sept. 23, 2021)). Especially in light of the fact that several Defendants have not yet produced financial statements, the Court finds that it would be premature to modify the asset freeze or receivership.

## IV. CONCLUSION

Having found that the likelihood of success on the merits and the balance of equities both weigh toward Plaintiff, the Court will grant the Motion for Preliminary Injunction. The evidence submitted with the briefing, as well as the evidence presented at the Preliminary Injunction hearing leads the Court to find that Plaintiff is likely to succeed on the merits of its claims that Defendants charge illegal advance payments and employ deceptive and misleading practices. Defendants' evidence presented in the briefing and at the hearing has not shown that Plaintiff is unlikely to succeed on the claims. Defendants did not meaningfully counter the evidence that payment was received

before credit repair services were fully completed or that the Google advertisements using keywords relating to debt collection agencies led consumers to believe they were contacting those agencies. The Court also finds that the asset freeze and receivership is still required at this time. Having considered all the evidence and the arguments of the parties, and having individually considered the *Winter* factors relevant to this FTC action, the Court finds that Plaintiff is entitled to a preliminary injunction.

Accordingly,

**IT IS ORDERED** that Plaintiff's Motion for Preliminary Injunction (Doc. 4) is **granted**.

**IT IS FURTHER ORDERED** that Defendants' Motion to Dissolve the Temporary Restraining Order, made in Court at the hearing, is **denied**.

Dated this 4th day of September, 2026.

Honorable Steven P. Logan
United States District Judge